IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


| | |
|---|---|
| RONALD LANE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| URS MIDWEST, INC., ) | |
| ) | No. 3:17-cv–0230-HRH |
| Defendant. ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | |


<u>O R D E R</u>

<u>Motion for Summary Judgment</u>

Defendant moves for summary judgment.[1]  This motion is opposed.[2]  Oral argument was requested and has been heard.

<u>Facts</u>

Plaintiff is Ronald Lane.  Plaintiff was born in 1942.  In 2015-2017, plaintiff lived in Virginia City, Montana.

Defendant is URS Midwest, Inc., a division of United Road Services, Inc. ("URS").  "URS transports vehicles across the State of Alaska, across portions of Canada, and in the

---

[1]Docket No. 32.

[2]Docket No. 41.

States of Oregon and Washington[.]"[3]  "URS operates in interstate commerce under the authority of the Federal Motor Carrier Safety Administration ('FMCSA'), which is an agency under the U.S. Department of Transportation's ('DOT') jurisdiction."[4]

Plaintiff began working for defendant as a long-haul truck driver in April 2000. Plaintiff was originally based in Billings, Montana, but for the last 8-10 years of his employment with defendant, he was based in Federal Way, Washington. "Plaintiff's primary job was transporting customers' vehicles to and from a variety of locations . . . via a car hauler tractor and trailer assigned to him by URS[.]"[5]  Plaintiff's 18-wheeler weighed 42,500 pounds when unloaded and more than 80,000 pounds when loaded.[6]  Plaintiff transported vehicles primarily in Alaska, Washington, Oregon, Idaho, and Montana.  But, plaintiff avers that "[b]etween the period of February 28, 2014 through November 15, 2015, . . . my travel during the trips w[as] exclusively within the State of Alaska."[7]

Plaintiff avers that his

> job duties as a truck driver for defendant required me to do a
> variety of tasks, in addition to driving.  For instance, I regularly
> hooked up trailers, fueled the truck assigned to me, tied down

---

[3]Declaration of Michael Martin at 2, ¶ 5, Docket No. 35.

[4]Id. at 3, ¶ 9.

[5]Id. at 5, ¶ 21.

[6]Deposition upon Oral Examination of Ronald Lane at 20:18-24, Exhibit 1, Declaration of Russell S. Linden, Docket No. 34.

[7]Affidavit of Ronald Lane [etc.] at 2, ¶ 4, Docket No. 56.

loads for the truck assigned to me, engaged in chaining and unchaining the wheels of the truck assigned to me, performed pre- and post-trip and in-transit equipment and load checks, attended to truck breakdowns, attended to truck repairs while in-transit, performed light maintenance, [did] offloading, completed required paperwork such as vehicle inspection reports and hours logs as required by the Department of Transportation, and wash[ed] the truck and trailer.[8]

Defendant paid its drivers such as plaintiff "in accordance with a commissions and bonus system."[9] Mike Martin, defendant's vice president of operations, avers that "the commissions amount fairly compensated . . . drivers" for all their job duties, "including . . . time spent (1) driving; (2) hooking up; (3) fueling; (4) tying down; (5) chaining up and unchaining; (6) performing pre-trip and in-transit equipment and load checks; (7) during breakdowns; (8) making repairs; (9) loading and offloading; and (10) completing required paperwork."[10]

"Between January 1, 2015 and his last day of active duty on October 31, 2016, [p]laintiff was paid a commission of 27% of the revenue generated per line haul trip."[11] Plaintiff avers that "[b]etween February 28, 2014 through October 31, 2016," defendant's bonus program was called "the Quality Fund Bonus Program" and that it was "3% of the

---

[8]Id. at 2, ¶ 3.

[9]Martin Declaration at 6, ¶ 26, Docket No. 35.

[10]Id. at 6, ¶ 28.

[11]Id. at 6, ¶ 27.

revenue generated per line haul trip."[12]  Plaintiff further avers that "[p]ayment from the Quality Fund, however, was restricted by the defendant, so that it could deduct from this fund if any damage . . . occurred to the cargo in-transit or to the vehicle used."[13]  "Plaintiff received $65,012.17 in wage compensation from URS in 2015 and $78,540.68 in wage compensation in 2016.[14]  Plaintiff avers that defendant also paid him "an hourly rate of $15.00 per hour for non-driving work, and a flat fee of $100 for washing the URS Midwest Inc. truck and trailer assigned to me."[15]  Plaintiff avers, however, that defendant "failed to pay me for hours that I spent driving my vehicle . . . when I had no cargo in the vehicle after a delivery, and I had to go to another location for a pickup ('Dead-heading[']")."[16]

On October 31, 2016, plaintiff was working on his truck in the URS garage in Anchorage when he noticed a pickup truck that had a dead battery.  Plaintiff jump-started the pickup and then left it running in order to charge the battery.  Around midnight that evening, plaintiff went to sleep in his truck's sleeper berth but forgot that the pickup was still running.  The next morning, plaintiff's supervisor, Jim Carey, found plaintiff in his sleeper berth overcome by carbon monoxide.  Plaintiff was taken by ambulance to Alaska Regional

---

[12]Lane Affidavit at 2, ¶ 6, Docket No. 56.

[13]Id.

[14]Martin Declaration at 7, ¶ 31, Docket No. 35.

[15]Lane Affidavit at 2, ¶ 7, Docket No. 56.

[16]Id. at 3, ¶ 8.

Hospital. While hospitalized, plaintiff suffered a heart attack due to the lack of oxygen in his blood stream. Plaintiff remained hospitalized for approximately one week.

After the carbon monoxide incident, plaintiff was placed on workers' compensation leave. After plaintiff's workers' comp leave expired, he was granted Family Medical Leave Act (FMLA) leave.

On January 27, 2017, plaintiff's doctor issued a "release to work" note, in which he stated that plaintiff "is recovering well. He is able to drive a commercial vehicle at this time, but he is still restricted to lifting a maximum of 20 pounds and refraining from any exertional activity."[17] On January 30, 2017, Carey forwarded this release to Colleen Ward, who then forwarded it to defendant's Human Resources department.[18] In her email, Ward stated that "Jim Carey would like to put him [plaintiff] back to work right away."[19] Sometime thereafter, Carey told plaintiff that he had to speak to Martin about coming back to work.

On February 9, 2017, plaintiff had a telephone conversation with Martin about coming back to work. What exactly was said by Martin during this conversation is in dispute and is discussed in detail below.

---

[17]Exhibit 9 to Lane Deposition, Exhibit 1, Linden Declaration, Docket No. 34.

[18]Exhibit D at 2, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Docket No. 41.

[19]Id.

Plaintiff avers that "[o]n February 10, 2017, . . . I went to the Alaska Department of Wage and Hour to file a complaint for unpaid overtime compensation."[20]  Plaintiff further avers that "[o]n February 28, 2017, I assigned my overtime claim against URS to Alaska's Wage and Hour Division."[21]

Plaintiff's FMLA leave expired on March 7, 2017.  On March 31, 2017, defendant reminded plaintiff that his FMLA leave had expired and informed plaintiff that "[y]our status had been converted to Inactive and your benefits ended effective March 31, 2017."[22]

On March 1, 2017, plaintiff filed an age discrimination complaint with the Alaska Equal Rights Commission.[23]  Plaintiff avers that "[a]fter my claim of discrimination had been investigated for more than 60 days, I opted to file my claim for age discrimination with the Federal Courts[.]"[24]

In March and April 2017, plaintiff began applying for jobs in Montana.  In May 2017, plaintiff began working as truck driver for A.M. Wells.[25]

---

[20]Lane Affidavit at 4, ¶ 14, Docket No. 56.

[21]Id. at 4, ¶ 15.

[22]Exhibit 10 to Lane Deposition, Exhibit 1, Linden Declaration, Docket No. 34.

[23]Exhibit F at 1, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Docket No. 41.

[24]Lane Affidavit at 6, ¶ 23, Docket No. 56.

[25]Lane Deposition at 10:12-25, Exhibit 1, Linden Declaration, Docket No. 34.

Plaintiff avers that "[o]n October 10, 2017, I received the reassignment of my wage claim against URS Midwest, Inc., so I could pursue this claim through a private attorney."[26]

On October 30, 2017, plaintiff commenced this action. In his amended complaint, plaintiff asserts an Age Discrimination in Employment Act (ADEA) claim and an overtime claim under the Alaska Wage and Hour Act (AWHA).

Defendant now moves for summary judgment on both of plaintiff's claims.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. <u>Id.</u> at 255. "'[T]he court's ultimate inquiry is to determine whether the specific facts set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" <u>Arandell Corp. v. Centerpoint Energy Services, Inc.</u>, 900 F.3d 623, 628–29

---

[26]Lane Affidavit at 4, ¶ 16, Docket No. 56.

(9th Cir. 2018) (quoting T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

Defendant first moves for summary judgment on plaintiff's ADEA claim. "The ADEA makes it unlawful for an employer to discriminate 'because of [an] individual's age.'" France v. Johnson, 795 F.3d 1170, 1172 (9th Cir. 2015) (quoting 29 U.S.C. § 623(a)(1)). An employee must be "at least 40 years of age" to be entitled to "[t]he protections of the ADEA. . . ." Day v. AT & T Disability Income Plan, 698 F.3d 1091, 1099 (9th Cir. 2012). It is undisputed that plaintiff is over 40 years of age.

As an initial matter, defendant suggests that plaintiff's ADEA claim may be subject to dismissal because plaintiff did not exhaust his administrative remedies. "An ADEA plaintiff can satisfy the exhaustion requirement by filing a charge of discrimination with the EEOC or the equivalent state agency and waiting 60 days." Marshall v. Silver State Disposal Service, Inc., Case No. 2:15-cv-00953-APG-PAL, 2016 WL 1298102, at *2, n.25 (D. Nev. March 31, 2016) (citing Sanchez v. Pac. Power Co., 147 F.3d 1097, 1099 (9th Cir. 1998)). Plaintiff filed a claim with the Alaska Human Rights Commission on March 1, 2017. His complaint was filed in this court on October 30, 2017, more than six months later. Plaintiff has exhausted his administrative remedies under the ADEA.

Turning then to the merits of plaintiff's ADEA claim, "[t]o prevail on a claim for age discrimination under the ADEA, a plaintiff must prove at trial that age was the 'but-for' cause of the employer's adverse action." Shelley v. Geren, 666 F.3d 599, 607 (9th Cir.

2012). A plaintiff may oppose a motion for summary judgment either by "present[ing] direct evidence of a discriminatory motive" or under "the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green[.]" France, 795 F.3d at 1173. Defendant first argues that plaintiff has not come forward with any direct evidence of a discriminatory motive.

"'Direct evidence, in the context of an ADEA claim, is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" Id. (quoting Enlow v. Salem–Keizer Yellow Cab Co., 389 F.3d 802, 812 (9th Cir. 2004)). "Direct evidence, which standing alone can defeat summary judgment, must be evidence directly tied to the adverse employment decision." Id.

Plaintiff contends that he has direct evidence of age discrimination in the form of Martin's statements during the February 9 phone call. In his first amended complaint, plaintiff alleged that during the phone call, Martin first offered him a severance package if he would quit and then told him that he was "too old to drive" and that he was not going to be allowed to drive anymore.[27] Plaintiff was then asked about this phone call at his deposition:

> Q. What did Mike Martin say during that call?
> A. He said he wouldn't put me back in another truck again because I'd lost my skills.

---

[27]Amended Complaint for Damages at 4, ¶¶ 2.13-2.14, Docket No. 5.

Q.    And what did you say in response to that?

A.    I told him I didn't think so.

Q.    And what did he say, if anything, in response to that?

A.    Well, he said he couldn't do it, but he would be willing to give me 25,000 – I'm not sure if it was this conversation or a later one, but he offered to give me $25,000 if I would take my body and go someplace else.

Q.    Anything else you recall about that five-minute phone conversation?

A.    Well, I think in the $25,000 deal, he was urging me to retire because I was getting too old.

Q.    Well, did he say to you, "I think you should retire because you're getting too old?"

A.    I believe just about in those words.

Q.    Okay.  What exactly were his words?

A.    Well, I don't remember his exact words, but that comes pretty close.

Q.    Well, did he say to you, "You're getting too old?"

A.    Yeah.

Q.    And this was in the phone conversation?

A.    Well – or maybe he didn't say that, maybe he said because of your age, whatever.  It was obvious what he was coming to.

Q.    Well –

A.    I had lost my skills and that I wouldn't be allowed back in a United Road truck.

Q.    So you said several different things there.  So again, I'm going to ask you to the best of your ability, Mr. Lane, to recall exactly what it was that Mike Martin said during this five-minute conversation.  I know you said at the very beginning when I asked you questions that he wouldn't let you back in the truck again because you lost your skills.  Did he say that?

A.    Yes.[28]

---

[28]Lane Deposition at 116:8-117:24, Exhibit 1, Linden Declaration, Docket No. 34.

Defendant argues that Martin's alleged statements cannot be direct evidence of age discrimination because plaintiff has given several versions of what Martin said. Defendant contends that plaintiff first claimed that Martin said he could not return to driving because he had lost his skills, then he claimed that Martin meant that he should retire because he was too old to drive, and finally plaintiff stated that he was not even sure if this was the conversation when age and money came up. Defendant argues that it is thus entirely unclear as to when, if ever, plaintiff is contending that Martin told him he could not return to work due to his age. And even if Martin said that plaintiff could not return to work because he had lost his skills, as plaintiff claims, defendant argues that this would not be direct evidence of age discrimination because it requires the listener to infer a nexus between skills and age. But, "'[d]irect evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (quoting Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir. 1994)). Defendant argues that there is a much more likely interpretation of what Martin meant when he allegedly said that plaintiff had lost his skills, given that plaintiff had just been on leave for several months after carelessly allowing himself to be poisoned by carbon monoxide. Plaintiff testified that he probably told Carey that he had been careless in leaving the pickup truck running and he admitted that it was a "dumb deal[.]"[29] Martin, for his part, avers that during the February 9 phone call, he "expressed concerns that based on his

_____

[29]Id. at 122:1-22.

negligently allowing himself to be exposed to carbon monoxide that [p]laintiff could not operate his truck in a safe and reliable manner. I did not reference age, or [p]laintiff's age, during this discussion[.]"[30] Thus, defendant argues that any reference to plaintiff having lost his skills was connected to the carbon monoxide incident, and not his age.

Although plaintiff's recollection of what Martin said during the February 9 conversation has not been crystal clear,[31] plaintiff has consistently maintained that Martin said that he had lost his skills and thus was too old to drive. This is sufficient evidence to defeat defendant's motion for summary judgment on plaintiff's ADEA claim. That the fact finder may have to draw an inference does not undercut this evidence because, as set out above, "'[d]irect evidence, in the context of an ADEA claim, is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" France, 795 F.3d at 1173 (quoting Enlow, 389 F.3d at 812).

---

[30]Martin Declaration at 8, ¶ 39, Docket No. 35.

[31]In his affidavit offered in support of his opposition to the instant motion, plaintiff offered what defendant contends is yet another version of what was said during the February 9 phone call. Defendant argued that plaintiff's averments on this issue should not be considered because they contradicted his deposition testimony, thereby making plaintiff's affidavit a sham affidavit. While plaintiff's averments in his affidavit did not necessarily contradict his deposition testimony about the February 9 phone call, even without these averments, there are material questions of fact as to what Martin said and meant during the February 9 phone call.

There are material questions of fact as to what Martin said and meant during the February 9, 2017 phone call. Defendant is not entitled to summary judgment on plaintiff's ADEA claim.

Defendant next moves for summary judgment on plaintiff's AWHA claim. "The AWHA governs payment of overtime compensation to employees, requiring that an employer pay an employee at a rate of pay for all hours worked in excess of eight in a working day and forty in a workweek." Schorr v. Frontier Transp. Co., 942 P.2d 418, 420 (Alaska 1997).

Defendant first argues that plaintiff cannot make a claim for overtime compensation under the AWHA because he did not live in Alaska, his work base was in Washington, and he did not principally work in Alaska. But because plaintiff is only claiming unpaid overtime for the period of time when he was working exclusively in Alaska, plaintiff can pursue an AWHA overtime claim.

Defendant next argues that plaintiff cannot pursue an AWHA overtime claim because such a claim is preempted by federal law. "Conflict preemption is implicit preemption of state law that occurs where there is an actual conflict between state and federal law." McClellan v. I-Flow Corp., 776 F.3d 1035, 1039 (9th Cir. 2015) (citation omitted). "Conflict preemption arises when [1] compliance with both federal and state regulations is a physical impossibility, . . . or [2] when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (citation omitted). Defendant argues that "the latter flavor of conflict, obstacle preemption, is at issue here." Id.

Defendant's argument is based on the fact that the overtime provisions of the Fair Labor Standards Act (FLSA) do not apply to employees of motor carriers who are subject to the Motor Carrier Act (MCA). Newhouse v. Robert's Ilima Tours, Inc., 708 F.2d 436, 438 (9th Cir. 1983). There is no dispute that defendant is a motor carrier subject to the MCA. "The FLSA exempts 'any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.'" Sleeper v. URS Midwest, Inc., 347 F. Supp. 3d 408, 412 (D. Alaska 2018) (quoting 29 U.S.C. § 213(b)(1)). The Secretary of Transportation has promulgated maximum hours of service rules pursuant to the MCA. Defendant argues that applying the AWHA requirements to line haul truck drivers, such as plaintiff, would undermine the purpose and objective of these uniform hours of service rules. Defendant argues that requiring plaintiff's hours and rate of pay to change based on which state he was crossing as part of his route would defeat the uniform hours of service rules promulgated by the Secretary of Transportation pursuant to the MCA.

Defendant acknowledges that the court reached a different conclusion in Sleeper, 347 F. Supp. 3d 408. There, defendant made the same argument as it makes here, that "Sleeper's AWHA claim is conflict preempted because [c]ompliance with the AWHA as it concerns line haul truck drivers subject to the authority of the Secretary of Transportation completely undermines the loosening of overtime and recordkeeping requirements provided by the MCA exemption to the FLSA." Id. at 415 (citation omitted). The court rejected this argument,

relying on <u>Agsalud v. Pony Express Courier Corp. of America</u>, 833 F.2d 809 (9th Cir. 1987), in which "the Ninth Circuit rejected an employer's argument 'that the Motor Carrier Act preempts Hawaii Revised Stat. § 387-3(a) requiring employers to pay time-and-one-half of work in excess of 40 hours per week.'" <u>Sleeper</u>, 347 F. Supp. 3d at 415 (quoting <u>Agsalud</u>, 833 F.2d at 810). The <u>Sleeper</u> court "read[] <u>Agsalud</u> broadly to hold that state overtime statutes are not preempted by the MCA." <u>Id.</u> at 416.

Defendant distinguishes this case from <u>Sleeper</u> based on the fact that Sleeper worked and drove almost entirely within Alaska, while plaintiff drove in other states as well as Canada. But, this is a distinction without a difference, given that plaintiff is only seeking overtime for the period of time when he was working exclusively in Alaska. The rationale of <u>Sleeper</u> applies here. Plaintiff's AWHA overtime claim is not preempted.

If plaintiff can pursue an AWHA overtime claim, which he can, there is a dispute as to what the relevant time period is for this claim. The AWHA provides that

> [a]n action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages under AS 23.10.050 - 23.10.150 is forever barred unless it is started within two years after the cause of action accrues. For the purposes of this section an action is considered to be started on the date when the complaint is filed.

AS 23.10.130. Plaintiff commenced this action on October 30, 2017. Thus, defendant argues that he can only recover unpaid overtime compensation for the time period of October 30, 2015 through November 15, 2015.

Plaintiff, however, contends that the relevant starting point for his AWHA overtime claim is February 28, 2015. Plaintiff avers that he assigned his wage claim to the State of Alaska on February 28, 2017 and the State of Alaska assigned it back to him on October 10, 2017.[32] Plaintiff thus argues that the statute of limitations was tolled between February 28, 2017 and October 10, 2017.

"The doctrine of equitable tolling relieve[s] a plaintiff from the bar of the statute of limitations when he has more than one legal remedy available to him so that after the plaintiff adopts a single course of action which is dismissed or otherwise fails, courts generally allow the plaintiff to pursue a second remedy based on the same right or claim." Fred Meyer of Alaska, Inc. v. Bailey, 100 P.3d 881, 886 (Alaska 2004) (citations omitted). A statute of limitations "is equitably tolled if (1) pursuit of the initial remedy gives defendant notice of plaintiff's claim, (2) defendant's ability to gather evidence is not prejudiced by the delay, and (3) plaintiff acted reasonably and in good faith." Id.

Defendant argues that equitable tolling would not apply to plaintiff's AWHA overtime claim because equitable tolling does not apply to FLSA claims. The AWHA provides that "[i]f not defined in this title or in regulations adopted under this title, terms used in" the AWHA "shall be defined as they are defined in [the] Fair Labor Standards Act. . . ." AS 23.10.145. The AWHA does not define "complaint" nor does the FLSA. But, the FLSA

---

[32]Exhibit G at 1, Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Docket No. 41.

statute of limitations provides that a FLSA action must be commenced within "two years after the cause of action accrued[.]" 29 U.S.C. § 255(a). And, at least one court has held that the filing of an administrative complaint does not toll the FLSA statute of limitations "because [a plaintiff] could have filed her FLSA claim," even though she had filed an administrative claim because the FLSA "has no administrative exhaustion requirement. . . ." Parada v. Banco Industrial De Venezuela, C.A., 753 F.3d 62, 71 (2d Cir. 2014).

Defendant also argues that plaintiff has not shown that he is entitled to equitable tolling. Defendant contends that the only evidence that plaintiff assigned his administrative claim to the State of Alaska on February 28, 2017 is his averment to that effect. Defendant points out that plaintiff has not offered as evidence a copy of his administrative complaint and that plaintiff testified at his deposition that he did not have copies of the paperwork he filled out in order to file his wage claim with the State of Alaska.[33] Defendant argues that plaintiff's averment is not sufficient evidence to support his contention that he filed an administrative claim and then assigned that claim to the State of Alaska on February 27, 2017.

There are material questions of fact regarding plaintiff's administrative claim. If plaintiff can establish that he filed an administrative claim and then assigned that claim to the State of Alaska in February 2015, as he avers, equitable tolling could apply to his AWHA

---

[33]Lane Deposition at 31:15-32:12, Exhibit 1, Declaration of Matthew E. Radler, Docket No. 46.

claim. "In Alaska, the doctrine of equitable tolling has been applied to halt the running of the statute of limitations when multiple legal remedies are available to the plaintiff and time runs out on one remedy while the plaintiff is pursuing another unavailing remedy." Kaiser v. Umialik Ins., 108 P.3d 876, 881 (Alaska 2005). That may be what happened here. Plaintiff may have been pursuing his overtime remedy administratively while the time on his judicial remedy ran out. If that is what happened, the relevant starting point for plaintiff's AWHA claim could be February 28, 2015.

Regardless of what the relevant starting point is though, defendant argues that it is still entitled to summary judgment on plaintiff's AWHA overtime claim because plaintiff is not entitled to any additional compensation. The AWHA provides that the overtime compensation provision

> does not apply with respect to . . . an individual employed as a line haul truck driver for a trip that exceeds 100 road miles one way if the compensation system under which the truck driver is paid includes overtime pay for work in excess of 40 hours a week or for more than eight hours a day and the compensation system requires a rate of pay comparable to the rate of pay required by this section[.]

AS 23.10.060(d)(15). "If an employer of a line haul truck driver elects not to use the overtime rate established in AS 23.10.060(b), the employer shall establish alternate rates of overtime pay that meet the requirements of AS 23.10.060(d)(15) and this section." 8 AAC § 15.101(a).

> An alternative rate of overtime pay may be calculated as a mileage rate, a fuel usage rate, or on some other reasonable

basis; however, any formula used to calculate an alternate rate of overtime pay must take into consideration the time spent performing all of the duties of a line haul truck driver on the route for which the rate was established, including the time spent

    (1) driving;
    (2) hooking up;
    (3) fueling;
    (4) tying down;
    (5) chaining up and unchaining;
    (6) performing pre-trip and in-transit equipment and load checks;
    (7) during breakdowns;
    (8) making tire repairs;
    (9) offloading; and
    (10) completing required paperwork.

8 AAC § 15.101(b). "This alternative rate of overtime pay must be explained in writing, and the written explanation must be signed by the employee." 8 AAC § 15.101(a). "Before implementing an alternate rate of overtime pay, an employer shall, in accordance with AS 23.05.160, notify each employee affected by the alternate rate of overtime pay on the payday before the new rate is implemented." 8 AAC § 15.101(d). "[A]n employer shall (1) annually certify that the rate of overtime pay for each route has been reviewed and found to be appropriate; and (2) post a copy of the annual certification and the rate of overtime pay for each route in a conspicuous place where each driver may review them." 8 AAC § 15.101(f).

Martin avers that defendant "determined that" the commission system it used to pay drivers "fairly compensated its drivers and exceeded minimum wage and overtime

requirements under Alaska state law."[34]  Martin further avers that defendant's "commissions and bonus system was described in writing to [p]laintiff and other truck drivers when hired, including with their employment offer letters."[35]  Martin also avers that "URS provided [p]laintiff with written notice of proposed changes to the commission-based or mileage-based compensation system."[36]  Plaintiff, however, avers that "[a]t no time during my employment with URS Midwest, Inc. have I been presented with a written document outlining an alternative overtime computation method.  Further, I have never signed any document identified as an alternative overtime computation agreement."[37]  Plainly, there are material questions of fact as to whether defendant complied with the AWHA in terms of its alternative compensation system.  These factual disputes preclude summary judgment in defendant's favor on plaintiff's AWHA claim.

Defendant next argues that it is entitled to summary judgment on plaintiff's AWHA overtime claim because plaintiff cannot establish how many hours of overtime he worked or how much his damages for this claim are.  See Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F. Supp. 2d 98, 119 (S.D.N.Y. 2009) (defendant entitled to summary judgment because the plaintiff did "not provide[] any factual basis to support a finding that she worked overtime

---

[34]Martin Declaration at 6, ¶ 28, Docket No. 35.

[35]Id. at 6, ¶ 29.

[36]Id.

[37]Lane Affidavit at 4, ¶ 13, Docket No. 56.

hours for which she was not paid").  Defendant contends that during discovery, plaintiff was asked to estimate and calculate the amount of overtime that he is seeking and that he never provided this information.  At his deposition, plaintiff was asked "have you figured out how much you believe you're owed under the Alaska Wage and Hour Act based on your review of your log books" and plaintiff replied "No."[38]  Defendant also points out that plaintiff was asked specifically about how much overtime he was claiming for two particular days in his log book, and he said he did not know how much money he was claiming for either day.[39]

Plaintiff contends that he can establish how many hours of overtime he worked.  Plaintiff avers that he "believe[s] I was continually working the entire duration of time that I was exclusively in Alaska."[40]  Thus, he argues that during the relevant time period, he worked every hour of every day but only got paid for 40 hours a week, and thus should be entitled to 128 hours of overtime each week.

Defendant, however, argues that, at the very least, plaintiff's AWHA overtime claim could not include any time plaintiff spent in the sleeper berth of his truck.  "Compensable hours" for purposes of the AWHA are defined by FLSA regulations.  8 AAC 15.105(b).  In terms of what are "compensable hours", FLSA regulations provide:

> Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona

---

[38]Lane Deposition at 68:13-16, Exhibit 1, Linden Declaration, Docket No. 34.

[39]Id. at 73:1-25.

[40]Lane Affidavit at 3, ¶ 10, Docket No. 56.

> fide meal periods and a bona fide regularly scheduled sleeping
> period of not more than 8 hours from hours worked, provided
> adequate sleeping facilities are furnished by the employer and
> the employee can usually enjoy an uninterrupted night's sleep.
> If sleeping period is of more than 8 hours, only 8 hours will be
> credited. Where no expressed or implied agreement to the
> contrary is present, the 8 hours of sleeping time and lunch
> periods constitute hours worked.

29 C.F.R. § 785.22. Defendant argues that plaintiff could usually enjoy an uninterrupted

night's sleep while in the sleeper berth. Martin avers that "[p]laintiff was not expected to

perform any work or respond to calls or contact from URS during sleeper berth hours."[41]

Thus, defendant argues plaintiff is not entitled to overtime under the AWHA for time spent

in the sleeper berth.

Defendant contends that plaintiff did not address the sleeper berth argument in his

opposition and thus has waived his claim for sleeper berth time. But, plaintiff did make a

rather conclusory argument that while in the sleeper berth, he was "engaged to wait" because

he could not go anywhere else and was waiting to start work. AWHA regulations provide

that "[w]hen computing an employee's hours for the purpose of determining overtime, the

employer shall count all hours the employee worked during that week including periods of

'on call' and 'standby or waiting time' required for the convenience of the employer which

were a necessary part of the employee's performance of the employment." 8 AAC 15.100(c).

Plaintiff avers that "when I had to stay in the sleeper berth," he could not use that time

---

[41]Martin Declaration at 6, ¶ 25, Docket No. 35.

"effectively for my own purposes because" he was often in "remote locations of Alaska."[42]

He also avers that when he was in his sleeper berth, "I was required to maintain control and care of the vehicles I was transporting and so I was not able to just leave the vehicle and its cargo unattended."[43]

The facts about how plaintiff used his time in the sleeper berth are in dispute. Martin says one thing and plaintiff says another. The court cannot conclude, at this point, that plaintiff is not entitled to overtime compensation for the time spent in the sleeper berth.

There are material factual disputes as to plaintiff's AWHA overtime claim. Thus, defendant is not entitled to summary judgment on plaintiff's AWHA claim.

## Conclusion

Defendant's motion for summary judgment is denied.

DATED at Anchorage, Alaska, this 8th day of August, 2019.

/s/ H. Russel Holland
United States District Judge

---

[42]Lane Affidavit at 3, ¶ 8, Docket No. 56.

[43]Id.